J-S57044-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: R.A.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.S., BIOLOGICAL | : | |
| FATHER | : | No. 867 MDA 2019 |

Appeal from the Order Entered April 29, 2019
in the Court of Common Pleas of Snyder County
Civil Division at No(s):  CP-55-OC-0000048-2018

BEFORE:  BOWES, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED JANUARY 24, 2020**

C.S. ("Father") appeals from the Order granting the Petition filed by Snyder County Children and Youth Services ("CYS"), and involuntarily terminating Father's parental rights to his minor, male child, R.A.S. (born in July 2016) ("Child"), pursuant to the Adoption Act.[1]   We affirm.

The family became involved with CYS in May 2016 based on allegations that Father had struck Child's half-sibling's neck hard enough to leave a curved bruise.  Order of Adjudication and Disposition-Child Dependent, 8/22/17.  As a result, Father pled guilty to simple assault and was sentenced to one year of probation, to be served consecutively to another probationary sentence.

---

[1] Child's mother, M.E.E. ("Mother"), consented to the termination of her parental rights.  On June 5, 2019, the Orphans' Court entered a Decree confirming Mother's consent and terminating her parental rights to Child. Mother did not appeal the Decree, and has not participated in this appeal.

Thereafter, CYS maintained involvement with the family. Order of Adjudication and Disposition-Child Dependent, 8/22/17. On May 9, 2017, Mother tested positive for methamphetamine, amphetamine, and marijuana. *Id.* Accordingly, CYS implemented a safety plan. *Id.* However, in August 2017, CYS received additional allegations that Mother had physically abused Child's half-sibling. *Id.* Further, on August 9, 2017, a CYS caseworker and Father's probation officer visited Father. *Id.* Father acknowledged using methamphetamine, and was thereafter incarcerated. *Id.* On August 10, 2017, the juvenile court issued an Order for emergency protective custody, transferring legal and physical custody of Child to CYS. Order, 8/10/17.

On August 22, 2017, the juvenile court adjudicated Child dependent. Order, 10/22/17. CYS implemented a family service plan. Father's objectives were to achieve and maintain sobriety; maintain parenting responsibilities and a healthy bond with Child; be involved with medical and dental appointments for Child; and improve family functioning by attending anger management and a parenting program. N.T., 4/16/19, at 52-53. Throughout Child's dependency, Father made little progress towards reunification. Moreover, on July 24, 2018, Father's probation was revoked, and on December 14, 2018, Father was committed to the State Intermediate Punishment Program ("SIPP") for a period of 24 months, with credit for time served from August 28, 2018. Sentencing Order, 12/14/18.

On August 20, 2018, CYS filed Petitions to involuntarily terminate Mother's and Father's parental rights to Child. On April 26, 2019, the Orphans' Court conducted a hearing on the Petitions.[2] CYS presented the testimony of Robert Meacham ("Mr. Meacham"), a licensed psychologist, who performed a bonding evaluation regarding Child, Mother, and Child's foster parents; Christopher Baker ("Mr. Baker"), Father's probation officer; and Seth Herb ("Mr. Herb"), a former CYS caseworker. Father testified on his own behalf.[3]

Mr. Herb testified that the main issues prompting Child's removal from Father's care were Father's abuse of Child's half-sibling and Father's drug use. N.T., 4/16/19, at 64. Mr. Herb further testified that Father was generally non-compliant with the family service plan. *Id.* at 40-41. Father failed to complete drug and alcohol treatment and did not produce *any* negative drug screens throughout the life of the case. *Id.* at 41, 44. Father visited Child regularly in September and October 2017, but only attended three visits with Child between November 2017 and December 2018. *Id.* at 47, 55. Further, Father did not complete anger management or parenting classes, and had no communication with Child's current foster parents. *Id.* at 49-50, 53.

---

[2] On August 30, 2018, the Orphans' Court entered an Order appointing Michael O'Donnell, Esquire ("Attorney O'Donnell"), to represent Child.

[3] The Orphans' Court incorporated the record regarding Father's criminal case and Child's dependency case.

Mr. Baker testified that, at the time of the hearing, Father was incarcerated. *Id.* at 24. Mr. Baker confirmed that Father's mental health and drug and alcohol counseling began in August 2017, but, by February 2018, Father's attendance was very poor. *Id.* at 25. Accordingly, Father did not successfully complete mental health and drug and alcohol counseling. *Id.* Further, Father's drug tests were positive for methamphetamines in February 2016, August 2017, and May 2018, and for opiates in January 2017. *Id.* at 29. Father also tested positive for marijuana numerous times. *Id.* From January 1, 2018, through May 2018, all of Father's drug tests were positive. *Id.* Moreover, Father's contact with Mr. Baker was sporadic. *Id.* at 30. Ultimately, Father's probation was revoked because Father did not successfully complete treatment; did not maintain contact with probation; failed drug tests; and was non-compliant with CYS. *Id.* After the revocation of his probation, Father was sentenced to SIPP, which includes a component of drug and alcohol treatment. *Id.* at 33.

Father testified that he is currently incarcerated, and would live with his girlfriend when released. *Id.* at 74. Father testified that he spent time with Child when Child was young. *Id.* at 74-75. However, after Child came into care, Father asserted that he missed visits because of his work schedule. *Id.* at 80-81. Further, Father blamed his failure to comply with CYS on his mental health and drug and alcohol issues. *Id.* at 82. Father claimed he stopped attending treatment because "[the counselor] kept telling me the same thing

over and over and over again[,] so I quit going." *Id.* While Father requested visits with Child while in prison, the prison would not allow the visits because his conviction involved the abuse of a minor. *Id.* at 78-79, 81, 83. Father testified that he began, but did not finish, anger management. *Id.* at 75-76. Father also testified that he attended drug and alcohol programming in prison and that he no longer had a substance abuse problem. *Id.* at 76-77. Further, Father claimed that he read parenting books from the prison library. *Id.* at 77-78. Father insisted that he wanted to retain his parental rights. *Id.* at 80.

Mr. Meacham testified that he had conducted interviews with Child, Mother, and Child's foster parents. *Id.* at 9. However, because of Father's imprisonment, Mr. Meacham was not able to conduct interviews with Father. *Id.* Mr. Meacham testified that Child was placed in foster care shortly after turning one. *Id.* at 11. Initially, Child was nonverbal, had a difficult time walking, did not interact with the foster parents, and did not make eye contact. *Id.* After obtaining early intervention services, Child quickly acquired age-appropriate skills and behavior. *Id.*

Mr. Meacham testified that Child is bonded with his foster parents and lives in the home with his half-brother. *Id.* at 11-12. Mr. Meacham observed that Child is emotionally attached to his foster parents and looks to them for his safety, security, and nurturing needs. *Id.* at 13-14. Mr. Meacham opined that it would be detrimental to sever Child's relationship with his foster parents. *Id.* at 14. Further, because Father had not seen Child in a year,

Child would likely have no recollection of Father. *Id.* at 17. However, Mr. Meacham was unwilling to assume there was no bond between Father and Child, because he could not perform an evaluation. *Id.* at 22.

Following the testimony, the court met with Child. The court observed that Child walked within three feet of Father, and that, while Child did not appear frightened of Father, Child also did not recognize Father. *Id.* at 86-87. While the court talked to Child, the court observed that Child, then two years and nine months old, could not communicate his preferred outcome, "other than to leave the courtroom after he got here." *Id.* at 121.

On April 29, 2019, the Orphans' Court entered the Order involuntarily terminating Father's parental rights to Child pursuant to section 2511(a)(1), (8), and (b).[4] Father timely filed a Notice of Appeal and Concise Statement of errors complained of on appeal.

Father raises the following issues on appeal:

1. Was termination erroneous[,] where counsel for [Child] did not properly articulate his client's position?

2. Was termination erroneous[,] where evidence indicated that Father exercised his parental rights and duties?

3. Was termination erroneous[,] where evidence indicate[d] that Father remedied the conditions which led to Child's removal?

---

[4] Although the Order does not mention section 2511(b), the Orphans' Court, in its on-the-record findings, concluded that termination of Father's parental rights met Child's needs and welfare pursuant to section 2511(b). N.T., 4/26/19, at 125-27.

Father's Brief at 4.

We review Father's claims mindful of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

In his first issue, Father contends that Child's counsel, Attorney O'Donnell, failed to appropriately represent Child's interests, as he did not present witnesses or exhibits at the termination hearing. Father's Brief at 7. Father asserts that counsel only participated in cross-examination of witnesses and oral argument, neither of which are evidence. *Id.* Father contends that counsel failed to indicate a preferred outcome for Child and that, even if Child was non-communicative, counsel was required to offer a preference. *Id.* at 8. Citing *In re Adoption of T.M.L.M.*, 184 A.3d 585, 589

(Pa. Super. 2018), Father posits that the failure of counsel to appropriately present Child's preferred outcome requires reversal.[5]  Father's Brief at 8.

Our Supreme Court, in *In re Adoption of L.B.M.*, 161 A.3d 172, 183 (Pa. 2017) (plurality), held that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in contested involuntary termination proceedings.  The Court noted that legal interests are synonymous with the child's preferred outcome, but the child's best interests are determined by the court.  *Id.*  The Pennsylvania Supreme Court has held that (1) a guardian *ad litem* may serve as counsel where there is no conflict between the child's legal and best interests, and (2) that there is no conflict between the child's best and legal interests if the child is non-communicative due to the child's young age.  *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018).

---

[5] After Father filed his brief, this Court expressly overruled *In re Adoption of T.M.L.M.*, concluding that this Court "does not have the authority to review *sua sponte* whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding."  *In re Adoption of K.M.G.*, 2019 PA Super 281 (*en banc*) (filed September 13, 2019), *appeal granted in part*, No. 362 WAL 2019, 2019 WL 6695448 (Pa. Dec. 9, 2019).  Further, this Court held that, in determining whether a conflict exists between a child's best interests and legal interests, "we should use the same standard of review when reviewing any factual determination of the orphans' court and give great deference to those factual findings."  *Id.*

Here, the Orphans' Court appointed Attorney O'Donnell as counsel for Child. At the termination hearing, Attorney O'Donnell initially asserted that counsel was "in line with the Agency…." N.T., 4/26/19, at 15. Thereafter, Attorney O'Donnell participated in the hearing by cross-examining witnesses. Further, at the conclusion of the termination hearing, Attorney O'Donnell argued that Child's best interests would be served by terminating Father's parental rights.[6] *Id.* at 106-09. The Orphans' Court, in its on-the-record findings of fact and conclusions of law, determined that Child could not communicate a preferred outcome, but that Attorney O'Donnell had asserted that the best interests and legal interests of Child were the same. *Id.* at 121-22. Further, the Orphans' Court concluded that Attorney O'Donnell, through his cross-examination, made it clear that he supported the termination of Father's parental rights. Orphans' Court Opinion, 6/28/19, at 2.

Our review of the record confirms that Attorney O'Donnell satisfied the requirements of section 2313(a). Both in his argument at the close of the termination hearing, and in Child's brief on appeal, Attorney O'Donnell has argued that the termination of Father's parental rights is in Child's best interests. Because Child was two years old, there could be no conflict between Child's best interests and Child's legal interests. *See In re T.S.*, 192 A.3d at

---

[6] Moreover, on appeal, Attorney O'Donnell has filed a brief asserting that termination of Father's parental rights is in the best interests of Child. Child's Brief at 11.

1092-93. The record confirms that Attorney O'Donnell appropriately advocated for Child's best interests, which could not conflict with Child's legal interests given Child's young age. We therefore conclude that Father's first issue does not merit relief.

In Father's second and third issues, he asserts that the Orphans' Court erred by involuntarily terminating his parental rights. Father's Brief at 8, 9. Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (8), as well as (b). This Court may affirm the Orphans' Court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), as well as section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Section 2511(a)(1), (8), and (b) provides as follows:

### § 2511. Grounds for involuntary termination

- 10 -

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b)  Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (8), and (b).

Although Father challenges the Orphans' Court's determinations pursuant to section 2511(a)(1) and (8), we focus on section 2511(a)(8), which requires clear and convincing proof "(1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions

which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006). In a section 2511(a)(8) analysis, "where a parent has addressed some of the conditions that led to a child's removal, but other conditions still exist, this element may be deemed to be satisfied." *In re D.A.T.*, 91 A.3d 197, 205-06 (Pa. Super. 2014). "Termination under [s]ection 2511(a)(8) **does not require the court to evaluate a parent's current willingness or ability to remedy the conditions** that initially caused placement or the availability or efficacy of Agency services." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (emphasis added, citations omitted).

> We recognize that the application of [s]ection (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children…. However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit[,] eighteen (18) months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

*In re Adoption of R.J.S.*, 901 A.2d at 513 (emphasis in original, citations omitted). "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available

resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (internal quotation omitted).

Furthermore, "we are instructed that we may not consider any effort by the parent to remedy the conditions described in subsection[] (a)(8) if that remedy was initiated after the parent was given notice that the termination petition had been filed." *In re Z.P.*, 994 A.2d at 1121 (citation omitted). This evidentiary limitation applies to the entire termination analysis. *Id.* The court, however, may consider post-petition efforts if the efforts were initiated before the filing of the termination petition and continued after the petition date. *Id.*

With respect to the "needs and welfare" analysis pertinent to section 2511(a)(8) and (b), we have observed the following:

> Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to [s]ection 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under [s]ection 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to [s]ection 2511(a), does a court "engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both [s]ection 2511(a)(8) and [s]ection 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to [s]ection 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed

by [s]ection 2511(b); as such, they are distinct in that we must address [s]ection 2511(a) before reaching [s]ection 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*)

(citations omitted).

With regard to section 2511(b), we apply the following analysis:

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [s]ection 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the section 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

With respect to section 2511(a)(8), Father does not directly challenge the Orphans' Court's determination that the termination of Father's parental rights would best serve the needs and welfare of Child. Rather, Father suggests that he resolved the issues that brought Child into care. Father's Brief at 8-9. Father asserts that he wrote from prison requesting contact with

Child and "apparently made other inquiries regarding his son." ***Id.*** at 9. Further, Father argues that he engaged in anger management, addressed his substance abuse issues, attended counseling, and obtained books from the prison library regarding parenting. ***Id.*** at 10. Father contends "he did everything he could under the difficult, sometimes admittedly self-inflicted, circumstances." ***Id.*** at 11.

Here, the Orphans' Court determined that Child was removed from Father's care due to his assault on Child's half-sibling and his drug abuse. N.T., 4/26/19, at 110. The Orphans' Court observed that Father did not regularly visit Child, was not successful with his drug and alcohol treatment, was not compliant with office and home visits, continued to use illegal substances, and was non-compliant with CYS. ***Id.*** at 111-12. The Orphans' Court credited testimony that, prior to his incarceration, Father failed to complete anger management. ***Id.*** at 115. The Orphans' Court acknowledged that Father made some progress regarding drug and alcohol treatment after Father was incarcerated, but concluded that, prior to the filing of the Petition to terminate his parental rights, Father had failed to complete an anger management program, did not complete drug and alcohol counseling, continued to use illegal drugs, and was incarcerated.[7] ***Id.*** at 117-18. While

_____

[7] The Orphans' Court credited testimony that, following the filing of the Petition, Father was sentenced to SIPP and began to address his drug and alcohol issues. N.T., 4/26/19, at 118.

the Orphans' Court observed that Father appeared to have made progress with respect to his drug and alcohol and anger management issues, the court concluded that Father had not first initiated those efforts prior to CYS giving notice of the filing of the Petition to involuntarily terminate Father's parental rights. *Id.* at 118, 125, 129.

Further, the Orphans' Court observed that Child had developmental issues while in Father's care, but thrived upon Child's removal. *Id.* at 125-26. Moreover, the Orphans' Court credited testimony that Child has a bond with his foster parents, who provide for his emotional, physical, and developmental needs. *Id.* Additionally, the Orphans' Court found that there was no bond between Child and Father. *Id.* at 126-27. Accordingly, the Orphans' Court determined that termination of Father's parental rights was appropriate.

We discern no error of law or abuse of discretion in the Orphans' Court's findings and conclusions. Child was removed from Father's care by court Order on August 10, 2017, more than twelve months prior to the filing of the August 20, 2018, Petition to involuntarily terminate Father's parental rights. Moreover, our review of the record confirms that the conditions that gave rise to the removal of Child, namely, Father's difficulty controlling his anger and drug abuse, continued to exist at the time the termination Petition was filed. The Orphans' Court reasonably disregarded Father's efforts towards remedying these issues, as it found that Father's efforts did not begin until

- 16 -

after Father had received notice of the filing of the termination Petition. Further, given Child's stability and strong bond with his foster parents, and the lack of any bond with Father, the Orphans' Court did not abuse its discretion in determining that the termination of Father's parental rights best serves the needs and welfare of Child. Thus, for all of the foregoing reasons, we conclude that the Orphans' Court did not abuse its discretion by involuntarily terminating Father's parental rights under section 2511(a)(8).[8]

Accordingly, because the Orphans' Court did not abuse its discretion in terminating Father's parental rights to Child, we affirm the termination Order.

---

[8] Based on this conclusion, we do not address section 2511(a)(1). **See In re B.L.W.**, 843 A.2d at 384. Further, Father failed to raise any argument with regard to section 2511(b) in either his Pa.R.A.P. 1925(b) Concise Statement, his Statement of Questions Involved, or his appellate brief. Accordingly, he has waived any issue regarding section 2511(b). **In re M.Z.T.M.W.**, 163 A.3d 462, 466 (Pa. Super. 2017). Nevertheless, had Father preserved a challenge with regard to section 2511(b), we would conclude that the Orphans' Court did not abuse its discretion by terminating Father's parental rights pursuant to section 2511(b). The evidence reflects that Child is thriving in his foster parents' home and is bonded to them. In contrast, Father lived an unstable life prior to his incarceration, was essentially uninvolved with Child, and Child has no bond with him.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/24/2020